## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRED'S INC., *et al.*, | Case No. 19-11984 (CTG) |
| Debtors. | (Jointly Administered) |
| FI LIQUIDATING TRUST, | |
| Plaintiff, | Adv. Proc. No. 21-51065 (CTG) |
| v. | **Related Docket No. 27** |
| C.H. ROBINSON COMPANY, INC., | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

To promote the objective of equal treatment of creditors, preference law allows a trustee in bankruptcy to recover amounts that the debtor paid, before the bankruptcy filing, to certain creditors while other similarly situated creditors went unpaid.[1] Under the statute, payments made by an insolvent debtor to creditors in the 90 days before bankruptcy, on account of an antecedent debt, are presumptively avoidable.[2] There are, however, several defenses that may be asserted by the recipient of an otherwise avoidable preference. One of those defenses is for payments made "in the ordinary course of business."[3]

---

[1] 11 U.S.C. § 547.

[2] *Id.* § 547(b).

[3] *Id.* § 547(c)(2).

The purpose of this "ordinary course of business" defense is to distinguish between a circumstance in which a creditor may be receiving "preferential" treatment, either because a debtor chose to pay creditors whom it liked or because a creditor somehow wrangled the payment out of the distressed debtor, from one in which the debtor's decision to pay that creditor was just business as usual. Accordingly, a creditor may establish a defense to a preference by showing that the payment was made "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was … made according to ordinary business terms."[4]

The record before the Court on the present summary judgment motion demonstrates that the defendant applied credit pressure to the debtor. When the debtor encountered financial distress, the defendant tightened the credit it was willing to extend, and only agreed to continue providing services to the debtor if the debtor would pay down some of the debt it then owed. The debtor did so. The defendant contends that such payments are still subject to the ordinary course defense set forth in § 547(c)(2)(B) because it asserts that it can establish that applying such credit pressure is entirely common in the transportation and logistics industry when a customer runs into financial distress, as the debtor did here.

That argument misapprehends the work done by the ordinary course defense. Because the ordinary course defense is intended to capture circumstances in which the debtor's decision to make the payment was simply business as usual, the

---

[4] *Id.*

statutory reference to "ordinary business terms" refers to the terms that apply in *ordinary* business circumstances – not terms that are imposed when a debtor runs into financial trouble.  It therefore is no defense to say that the credit pressure the defendant imposed was "ordinary" in the industry when customers face similar financial distress.  As such, the Court will grant partial summary judgment to the liquidating trust on the availability of the ordinary course defense.

## Factual and Procedural Background

Fred's operated a chain of a general merchandise retail stores located in the southeastern United States.[5]  Fred's selected C.H. Robinson as its "lead logistics provider."[6]  The two parties accordingly entered into an agreement in April 2019 under which C.H. Robinson would provide the debtor with transportation brokerage services.[7] This agreement required Fred's to pay C.H. Robinson for its services within 30 days of invoice and initially set a credit limit of $3 million, as part of an anticipated $45 million business relationship.[8]

As the debtor ran into financial distress, C.H. Robinson responded by tightening the credit terms.  This tightening is set forth in a chart that was included

---

[5] *In re Fred's Inc.*, No. 19-11984 (Bankr. D. Del. Sept. 9, 2019), D.I. 17.  Citations to materials on the docket of the main bankruptcy case are cited as "Main Case D.I. __."  In the interest of simplicity, the various debtors in the main bankruptcy case are referred to collectively as either "Fred's" or the "debtor."  The Court points to the first-day declaration in the main case only for general background and matters that are properly subject to judicial notice.  For material facts that bear on the pending motion for summary judgment, the Court of course relies exclusively on the materials in the summary judgment record.

[6] D.I. 28-1 ¶ 7.

[7] *Id.*, Ex. A (Agreement for Transportation Brokerage).  Defendant C.H. Robinson Co., Inc. is referred to as "C.H. Robinson."

[8] *Id.* at ¶¶ 8-9.

in the summary judgment record, which shows that C.H. Robinson reduced the debtor's credit limit from $3 million to $1.75 million on June 21, 2019 on account of Fred's announcement of a "round of store closings."[9]    In July 2019, C.H. Robinson further reduced Fred's credit limit to $1 million.[10]

Email correspondence between the parties similarly reflect that C.H. Robinson was imposing credit pressure on the debtor to extract payment and thus reduce its own exposure.  A July 11, 2019 email from a representative of C.H. Robinson noted that certain invoices were overpaid because "fuel was incorrectly calculated."[11]  C.H. Robinson asked if the credits could be applied to Fred's oldest invoices to "help the current financial situation."[12]  In response to a follow up question, the C.H. Robinson representative said that the debtor was on a "credit hold" and that as a result, C.H. Robinson would not ship the debtor's goods.[13]  That email was forwarded internally within Fred's, with the company's CEO noting that Fred's would "need to pay them 300k tomorrow to keep them shipping to stores."[14]  That $300,000 was apparently included in a $800,000 wire payment that Fred's made to C.H. Robinson on the next day.[15]

---

[9] *Id.*, Ex. B at 66 of 137.

[10] *Id.*

[11] *Id.*, Ex. G at 99 of 137.

[12] *Id.* at 104 of 137.

[13] *Id.* at 103 of 137.

[14] *Id.* at 102 of 137.

[15] *See id.* at 69 of 137.

Less than a week later, on July 17, 2019, a different representative of C.H. Robinson emailed the debtor to express concern that things were "taking a further turn for the worse."[16]   The C.H. Robinson representative said that the credit terms would be reduced to "14 days to pay with a credit limit of $1M."[17]

Fred's filed for bankruptcy on September 9, 2019.[18]   The debtor confirmed a liquidating plan of reorganization in June of 2020 under which Anthony M. Saccullo was named the liquidating trustee of the FI Liquidating Trust.[19]   The plan vested chapter 5 causes of action, including preference claims, in the trust.[20]   The trust brought this preference action against C.H. Robinson, contending that, within the 90-day preference period (June 11, 2019 to September 9, 2019) Fred's made multiple payments totaling $3,454,012.88 to C.H. Robinson.   This action seeks to avoid and recover those allegedly preferential transfers.

In support of its motion for summary judgment, the trustee attached a chart identifying 15 separate transfers – one made by check, five by ACH, and nine by wire transfer – totaling $3,454,012.88.[21]   The trustee also attached a chart showing the invoices against which these payments were applied and the underlying cancelled checks and bank statements showing that these payments were made from the

---

[16] *Id.* at 106 of 137.

[17] *Id.*

[18] Main Case D.I. 1.

[19] Main Case D.I. 1162. Saccullo is referred to as the "liquidating trustee" and the FI Liquidating Trust is referred to as the "liquidating trust" or the "trust."

[20] *Id.*

[21] D.I. 28-1 at 69 of 137.

debtor's accounts.[22]  Finally, the trustee acknowledged that C.H. Robinson provided new value to the debtor, in the amount of $1,923,624.28, after the receipt of the allegedly preferential payments, and thus was entitled to a defense in that amount under § 547(c)(4).  A chart showing this new value analysis was also attached to the summary judgment motion.[23]

In opposing the trustee's motion for summary judgment, C.H. Robinson largely accepted the trustee's statement of facts.[24]  Indeed, a declaration submitted by John Strange, a C.H. Robinson manager who oversaw C.H. Robinson's account with the debtor, explained that C.H. Robinson reduced the debtor's available credit "[d]ue to [the debtor's] store and distribution center closures."[25]  Strange contends that it is C.H. Robinson's "standard practice" to adjust a customer's credit limit in view of the "client's credit profile, including its existing financial status and projections of future financial performance."[26]  Strange further describes these practices as "standard within the transportation and logistics industry."[27]

C.H. Robinson did, however, take two exceptions to the facts set forth by the trustee.  *First*, it contends that, based on its review of its own books and records, the payments it received from the debtor during the preference period total only

---

[22] *Id.*, Ex. D (70-72 of 137), Ex. E (73-93 of 137).

[23] D.I. 28-1, Ex. F (94-96 of 37).

[24] D.I. 30 at 2.

[25] D.I. 30-2 ¶ 20.

[26] *Id.* ¶ 6.

[27] *Id.* ¶ 8.

$3,125,856.14 – which is $328,156.74 less than the trustee contends was transferred.[28] And while the trustee attached to its summary judgment motion the underlying checks and bank statements that appear to demonstrate that the debtor in fact made $3,454,012.88 in transfers to C.H. Robinson, the parties agree that the trustee never produced those cancelled checks or bank statements to C.H. Robinson in discovery.[29] *Second*, C.H. Robinson also contends that it provided approximately $43,000 more in new value than the approximately $1.92 million that the trustee acknowledges it provided.

On September 30, 2024, the Court heard argument on the trustee's motion for summary judgment. In substance, the parties' briefs dispute only two issues: (1) the amount of the transfers that occurred during the preference period and (2) the availability of the "ordinary course of business" defense.[30] At the outset of that argument, the Court expressed its preliminary views (subject to the parties' rights to be heard) on the two issues.

On the *first* issue, the Court stated that even accepting the trustee's assertion that the failure to produce the underlying bank statements and cancelled checks in

---

[28] D.I. 30 at 5-6; D.I. 30-1 at 45-90 of 222 (setting forth the dates of the $3,125,856.14 in payments C.H. Robinson acknowledges having received).

[29] D.I. 30 at 4; D.I. 32 at 7 n.7 (trustee describes his failure to produce the documents at issue as inadvertent).

[30] The trustee acknowledges that C.H. Robinson has a valid new value defense with respect to $1,923,624.28 of the payments under § 547(c)(4) of the Bankruptcy Code. D.I. 28 at 24; D.I. 28-1, Ex. F. *But see* D.I. 28 at 8 (setting forth a slightly different number). C.H. Robinson, however, contends that the value of the "new value" it provided is $1,966,343.17. D.I. 30-1 at 222 of 222. The extent of the available new value defense, however, necessarily depends on the transfers in question that are otherwise avoidable. This issue is addressed further in Part III of this Memorandum Opinion.

discovery was inadvertent, the failure of a party to produce documents in discovery that are responsive to an opposing party's document requests operates to preclude that party from presenting that evidence at trial.[31]    And under Rule 56(c)(2), the factual support for a summary judgment motion must be based on material that "would be admissible in evidence."[32]  The Court accordingly suggested that while C.H. Robinson could and should be held to its admission that it received transfers of $3,125,856.14, the trustee would not be permitted to rely on documents it failed to produce in discovery to prove up the additional $328,156.74 in alleged transfers.[33]

On the *second* issue, the Court expressed the preliminary view that, because it was undisputed that C.H. Robinson applied credit pressure to extract payment from the debtor, the ordinary course defense would not apply.[34]

C.H. Robinson took issue only with respect to the Court's preliminary observations regarding the ordinary course defense, suggesting that the defense ought to be available so long as the credit pressure it applied to the debtor was commonplace within the relevant industry.    The Court was skeptical of that contention.  C.H. Robinson responded by seeking leave to file a supplemental brief to further elaborate its position.  Both parties filed such supplemental briefs.[35]  That briefing, which was quite helpful to the Court, was completed in November 2024.

---

[31] *See* Fed. R. Civ. P. 37(c)(1), made applicable hereto by Fed. R. Bankr. P. 7037.

[32] Fed. R. Civ. P. 56(c)(2), made applicable hereto by Fed. R. Bankr. P. 7056.

[33] Sept. 30, 2024 Hr'g Tr. at 4-6.

[34] *Id.* at 6-7.

[35] D.I. 48, 49.

## Jurisdiction

The trustee asserted claims to avoid and recover preferential transfers and fraudulent conveyances.  These claims arise under the Bankruptcy Code (§§ 547, 548, and 550) and are thus within the district court's "arising under" jurisdiction as set out in 11 U.S.C. § 1334(b).  These cases have been referred to this Court under 28 U.S.C. § 157(a) and the February 29, 2012 Standing Order of Reference of the United States District Court for the District of Delaware.

## Analysis

The trustee's motion for summary judgment is brought under Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056.  The basic summary judgment standards are of course familiar.  A court shall grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[36]  The "party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact."[37]  If the moving party is able to meet this burden, "[the burden then] shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'"[38]

The question is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in

---

[36] Fed. R. Civ. P. 56(a).

[37] *Johnson v. U.S. Postal Serv.*, 64 F.3d 233, 236 (6th Cir. 1995).

[38] *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

favor of either party."[39] This analysis "must be guided by the substantive evidentiary standards that apply to the case."[40] Furthermore, "[a]n opposition to summary judgment cannot rely on mere allegations or general denials in either its pleadings or its briefs; rather, specific and material facts for trial, together with probative evidence supporting such facts, must be identified."[41]

## I.    The trustee is entitled to partial summary judgment on the claim that the debtor's transfers to C.H. Robinson, totaling $3,125,856.14 during the preference period, are presumptively avoidable.

The first question is whether the trust has met its burden of establishing the *prima facie* elements of a transfer as set forth in § 547(b).  With respect to the amounts of the transfers themselves, the Court will not permit the trustee to rely on documents it failed to produce in discovery.  It will, however, hold C.H. Robinson to its admission that it received $3,125,856.14 in transfers from the debtor during the preference period.  The other elements of a preference set forth in § 547(b) are not contested by the parties and the record demonstrates that they are satisfied.

### A.    Because the trustee did not produce its underlying evidence of the transfers in discovery, it may not rely on those documents in support of summary judgment.

The Bankruptcy Code vests trustees with the authority to avoid and recover "any transfer of an interest of the debtor in property" made in satisfaction of prepetition debt within 90 days of the bankruptcy petition date, subject to various

---

[39] *Anderson*, 477 U.S. at 250.

[40] *Id.* at 255.

[41] *American Express Bank v. Mowdy*, 526 B.R. 63, 73 (Bankr. W.D. Okla. 2015) (citing *State Farm Fire and Cas. Co. v. Edie*, 314 B.R. 6, 18 (Bankr. D. Utah 2004)).

defenses.[42]  Section 550(a) empowers the trustee to recover such avoided transfers, whether from the initial transferee, the entity for whose benefit the transfers were made, or any subsequent transferee.[43]  It is the trustee's burden, however, to demonstrate the elements of a *prima facie* case under § 547(b).

In the context of summary judgment, Rule 56(c) permits parties to cite documents, records, declarations, depositions, and other materials in the record to show that a factual assertion is not subject to genuine dispute.[44]  Rule 56(c)(2), however, provides a mechanism for an opposing party to object to the reliance on the cited material on the grounds that it "cannot be presented in a form that would be admissible in evidence."[45]  This objection mechanism functions analogously to trial objections, requiring parties who rely on specific documents or testimony to demonstrate their admissibility under the Federal Rules of Evidence.[46]

The trustee's motion for summary judgment relies substantially on documents that were not produced in discovery.  To demonstrate the transfers' existence, amounts, and timing, the trustee relies on Exhibit C of the Saccullo Declaration, which includes the underlying checks and bank statements showing the dates and

---

[42] 11 U.S.C. § 547.

[43] *Id.* § 550.

[44] Fed. R. Civ. P. 56(c)(1) (identifying the types of "materials in the record" that may be cited in support of a motion for summary judgment).

[45] *Id.* 56(c)(2).

[46] Fed. R. Civ. P. 56, committee notes on 2010 amendment ("The objection functions much as an objection at trial."); *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 362 F. Supp. 3d 226, 234 (D. Del. 2019) ("If the inadmissible evidence cannot be converted into admissible form, it must be excluded.").

amounts of the various transfers.  That exhibit was attached to the brief in support of the motion for summary judgment.[47]  Those underlying documents, however, were not produced during discovery, and therefore cannot be relied on here.[48]

In its opposition brief, however, C.H. Robinson acknowledges receipt of $3,125,856.14 in transfers from the debtor during the preference period and sets forth a chart showing the dates and amounts it admits it received from the debtor during the preference period.[49]  Under Federal Rule of Evidence 801, this admission qualifies as an admissible statement of a party opponent.[50]

The Court accordingly concludes that the trustee is entitled to partial summary judgment that the debtor made transfers to C.H. Robinson, in the amount of $3,125,856.14, during the preference period.

### B.    The remaining elements of § 547(b) are satisfied.

In addition to showing the amounts transferred, under 11 U.S.C. § 547(b), a trustee bears the burden of establishing specific elements to demonstrate that the payments are presumptively preferential.[51]  To make out this *prima facie* case, the trustee must show that: (i) the transfer was made to or for the benefit of a creditor; (ii) it was made on account of an antecedent debt; (iii) it occurred while the debtor

---

[47] *See* D.I. 28-1 at 68 of 137.

[48] Fed. R. Civ. P. 37(c)(1).

[49] D.I. 30-1 at 45-90 of 222.

[50] Fed. R. Evid. 801 ("A statement that meets the following conditions is not hearsay … the statement is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").

[51] 11 U.S.C. § 547(b).

was insolvent; (iv) it was made within 90 days before the bankruptcy filing; and (v) it enabled the creditor to receive more than it would have received in a hypothetical Chapter 7 case.[52]

Aside from the amount of the transfers, addressed above, C.H. Robinson does not contest the satisfaction of the other elements of the trustee's § 547(b) claim.  The evidence in the summary judgment record establishes a *prima facie* showing of preference with respect to transfers totaling $3,125,856.14.  There is no dispute that the payments totaling $3,125,856.14 were made from the debtor to C.H. Robinson.  The payments were made on account of obligations that arose before the payments and thus satisfied antecedent debt.  C.H. Robinson has not sought to rebut the presumption established under § 547(f) that the debtor was insolvent in the 90 days before the bankruptcy filing.  And there is no dispute that the payments left C.H. Robinson better off than it would have been had it not received the payments and the case filed as one under chapter 7.

## II.    The trustee is entitled to partial summary judgment on the ordinary course defense.

Section 547(c)(2)(B) provides that "the trustee may not avoid … a transfer … to the extent that such transfer was … in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was … made according to ordinary business terms."[53]

---

[52] *Id.*

[53] 11 U.S.C. § 547(c)(2)(B).  In its answer to the complaint, C.H. Robinson also raised a defense under § 547(c)(2)(A).  D.I. 11.  That provision is about transfers that were made in the

While preference law generally seeks to equalize creditor distributions by undoing payments made to certain creditors when others remained unpaid, the ordinary course defense gives the creditor who received the payment the opportunity to rebut the presumption that such a payment was "preferential" by establishing that it was made "in the ordinary course" of business.[54]  The statutory language requires the creditor to show that the that the debt itself was incurred in the ordinary course of the business of both parties and that the payment of that debt was *either* (a) made in the ordinary course of the business of both parties (what is sometimes described as the "subjective" test) *or* (b) made according to ordinary business terms (the "objective" test).  Significantly, before the 2005 amendments to the Bankruptcy Code, a defendant was required to show *both* that the payment was made in the ordinary course of the parties' businesses *and* that it was made according to ordinary business terms.  The 2005 amendments changed the requirements from being conjunctive to disjunctive.

As the legislative history makes clear, the point of this defense is "to leave undisturbed normal financial relations" and to discourage "unusual actions," such as

---

ordinary course of the business affairs of the debtor and the transferee, as opposed to the standard industry terms that are the subject of § 547(c)(2)(B).  C.H. Robinson has not, however, invoked this defense in opposition to the trustee's summary judgment motion.  *See* Sept. 30, 2024 Hr'g Tr. at 42.

[54] *See* American Bankruptcy Institute Task Force on Preferences, ABI Preference Survey Report (1997) (Tabb, C. Reporter) observing the ordinary course of business defense of § 547(c)(2) is the most raised preference defense in the Code); Bruce S. Nathan, *The Ordinary-Course-of-Business Defense to Preference Claims: First Time Transactions Count Tool*, 22 AM. BANKR. INST. J., Nov. 2003 at 14, 14 ("One of the most frequently litigated preference defenses is the ordinary course of business defense provided in § 547(c)(2).").

the imposition of credit pressure, that might destabilize a debtor nearing bankruptcy.[55] This preservation of routine interactions is intended to encourage vendors to continue to deal with distressed companies on ordinary terms, and thus provide companies facing some measure of financial distress the opportunity to weather the storm and perhaps avoid a bankruptcy filing.[56] The phrase "ordinary business terms" in the objective test looks to the general norms of the creditor's industry.[57] And Third Circuit precedent explains that "transfers may be avoided only if they are 'so idiosyncratic as to fall outside that broad range' of practices customary to the creditor's industry."[58]

   To that end, C.H. Robinson argues that the transfers it received from Fred's were made according to "ordinary business terms" and thus protected by the ordinary course defense.[59] C.H. Robinson relies primarily on a declaration from John Strange, its Director of Strategic Accounts, which seeks to establish it is common in the

---

[55] S. Rep. No. 95–989, 95th Cong., 2d Sess., at 88 (1978); H.R. Rep. No. 95–595, 95th Cong., 1st Sess., at 373 (1977) (The exception was intended to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.").

[56] *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 223-25 (3d Cir. 1994).

[57] *Abovenet, Inc. v. Lucent Technologies, Inc.*, 2005 WL 3789133, at *5 (Bankr. S.D.N.Y. Dec. 20, 2005) ("[The objective test] looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on general practices in the industry, in particular the industry of the creditor.").

[58] *Molded Acoustical*, 18 F.3d at 224. *See also In re Conex Holdings, LLC*, 524 B.R. 55, 59 (Bankr. D. Del. 2015); *Stanziale v. S. Steel & Supply LLC*, 518 B.R. 269, 285 (Bankr. D. Del. 2014) (quoting *In re American Home Mortg. Holdings, Inc.*, 476 B.R. 124, at 140-141 (Bankr. D. Del. 2012)).

[59] D.I. 48 at 7-14.

transportation and logistics industry for a supplier to tighten the credit terms once it becomes clear that a customer is facing financial difficulty.[60]

The fundamental disagreement between the parties is over whether "ordinary course" means terms that are ordinary when dealing with a *healthy* company, or whether the defense is still available when the defendant was imposing credit pressure on the debtor, so long as the defendant can show that it was customary in the relevant industry to impose such credit pressure on customers in financial distress.

The Bankruptcy Court for the Western District of Pennsylvania addressed this precise issue in *Erie County Plastics Corp.*[61]  There, a preference defendant had put the debtor, which had a large outstanding balance, on a payment plan.  The defendant agreed to deliver future goods, on a cash-on-delivery basis, only so long as the debtor was making the required payments under the payment plan.  The defendant argued (as C.H. Robinson does here) that it should be permitted to establish an ordinary course defense if it could prove that the way it treated the debtor was similar to how "other suppliers in the industry [] treat … customers similar to the Debtor, who have large balances that they are unable to pay on a current basis."[62]

---

[60] D.I. 30-2 at 1 of 18 (Strange Declaration).

[61] *In re Erie County Plastics Corp.*, 438 B.R. 89, 92 (Bankr. W.D. Pa. 2010).

[62] *Id.* at 91.

The court rejected that argument.  It noted that decisions from the Second, Eighth and Ninth Circuits supported the defendant's position.[63]  But the court noted that the Third Circuit, in *Molded Acoustical*, like the Tenth Circuit in *Meridith Hoffman Partners*, adopted the "healthy debtor" standard.[64]

That conclusion was correct.  Indeed, the *Molded Acoustical* court expressly rejected the claim (there, in the context of the subjective test) that conduct of the defendant there should be treated as ordinary because it was similar to the treatment the defendant afforded to two other vendors, both of whom "were delinquent in their payments" and "eventually filed for bankruptcy."[65]  One's dealings with companies facing financial distress is not the measure of ordinariness.  Rather, "ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships."[66]

The point of the ordinary course defense, after all, is to "deter[] the failing debtor from treating preferentially its most obstreperous or demanding creditors" and to "discourag[e] … creditors from racing to dismember the debtor."[67]  Indeed, the Third Circuit made a similar point in *Hechinger*, where it found that the debtor's

---

[63] *Id.* at 92 (citing *In re U.S.A. Inns of Eureka Springs, Ark., Inc.,* 9 F.3d 680, 685–686 (8th Cir. 1993); *In re Roblin Indus., Inc.,* 78 F.3d 30, 42 (2d Cir. 1996); *In re Jan Weilert RV, Inc.,* 315 F.3d 1192 (9th Cir. 2003)).

[64] *Id.* (citing *In re Meridith Hoffman Partners*, 12 F.3d 1549, 1553 (10th Cir. 1994); *see also Molded Acoustical*, 18 F.3d at 227).

[65] *Molded Acoustical*, 18 F.3d at 227.

[66] *Id.* (citing *In re Meridith Hoffman Partners*, 12 F.3d 1549, 1553 (10th Cir. 1994) ("Ordinary business terms therefore are those used in 'normal financing relations'; the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy.").

[67] *Molded Acoustical,* 18 F. 3d at 219.

17

payments were not made in the ordinary course when the defendant (like C.H. Robinson did here) "tightened its credit terms [and] imposed a credit limit."[68]

In response, C.H. Robinson makes essentially two points. *First*, C.H. Robinson argues that caselaw (like *Molded Acoustical*) that preceded the 2005 Amendments has effectively been abrogated by Congress and is no longer controlling.[69] That is incorrect. To be sure, as Judge Sontchi explained in *Conex*, the 2005 Amendments mean that a defendant needs to prove *either* that the payment was made in the ordinary course of the parties' dealing *or* according to ordinary business terms – not both. And to that end, it may well be fair to say that, at the margins, courts before the 2005 Amendments may have taken a stricter view of the relevant industry standards in cases in which the parties had no course of dealings before the preference period, which stricter approach is no longer appropriate now that a satisfaction of either standard is sufficient.[70] But nothing about the 2005 Amendments changes the Third Circuit's conclusion in *Molded Acoustical* that the relevant yardstick for purposes of the ordinary course defense is a healthy debtor rather than one in financial distress.[71]

---

[68] *In re Hechinger Inv. of Delaware, Inc.*, 489 F.3d 568, 578 (3d Cir. 2007).

[69] D.I. 48 at n. 5, 8-11.

[70] *In re Conex Holdings, LLC,* 518 B.R. 269, 279-280 (Bankr. D. Del. 2014).

[71] *See also* 5 *Collier on Bankruptcy* ¶ 547.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) ("[T]he case law regarding 'ordinary course of business' has been well developed for some time. These cases survive the enactment of the 2005 amendments since the language of each prong of the defense remains unchanged.").

It is true, as the *Erie County Plastics* court observed, that this is a question on which there appears to be a circuit split.  That said, the Third Circuit's approach (in addition to being binding here) better accords with the underlying congressional purpose in adopting the ordinary course defense, which was to keep distressed companies out of bankruptcy by creating an incentive for vendors to continue extending credit.  That purpose requires the adoption of the "healthy debtor" standard for measuring what is ordinary in the relevant industry.

*Second*, C.H. Robinson points to Judge Walrath's recent decision in *Center City Healthcare*, which it contends supports its argument that "ordinary" business terms include terms that are ordinary in light of the debtor's financial condition.[72]  That is a misreading of the *Center City Healthcare* decision.  The principal holding of that case was that data published by the Risk Management Association was properly admissible, under the hearsay exception set out in Federal Rule of Evidence 803(17) for compilations of market information, as evidence of "ordinary" terms within an industry.[73]

The opinion does go on to reject the debtor's argument about the defendant's allegedly "extraordinary" collection efforts.  But the specific argument that the debtor was there making (and that the court rejected) was focused on "the fact that the Debtors and Defendant never had 'ordinary course of business' dealings."[74]  The court

---

[72] *See In re Center City Healthcare, LLC,* 664 B.R. 208 (Bankr. D. Del. 2024).

[73] *Id.* at 213-214.

[74] *Id.* at 216.

rejected *that* argument, which effectively sought to rely on the dealings between the parties when the asserted defense related only to whether the payments were made on terms that were customary in the industry. To further underscore the disjunctive nature of the current Code, Judge Walrath explains that the debtor's argument "provide[s] no authority for the proposition that bankruptcy policy demands that the Court import the subjective analysis into the objective one."[75]

To that end, the *Center City Healthcare* court emphasized that the plaintiff was wrong to rely on the "*Defendant's* collection activity" when the relevant issue was the "objective course of business." That standard turns on what is customary in the relevant industry.[76] And like Judge Sontchi in *Connex*, Judge Walrath noted that after the 2005 amendments, a preference defendant is required to show "that the parties acted *either* in the ordinary course of their own business dealings *or* in the ordinary course of business dealings in the industry."[77]

But nothing in *Center City Healthcare* rejects the proposition, established by the Third Circuit in *Molded Acoustical*, that regardless of whether the relevant standard against which the challenged payments are measured is the subjective one of § 547(c)(2)(A) or the objective one of § 547(c)(2)(B), the standard is based on the terms that prevail when the debtor is healthy, not in financial distress. Applying that principle here, the summary judgment record makes clear that throughout the

---

[75] *Id.* at 217.

[76] *Id.* (emphasis added).

[77] *Id.* (emphasis in original).

preference period C.H. Robinson was applying credit pressure to the debtor, including threatening to discontinue providing services if the debtor failed to make payment. There is nothing in the record to suggest that this is the way a vendor in the shipping and logistics industry would treat a financially healthy customer.  Based on the summary judgment record before the Court, the trustee is thus entitled to partial summary judgment that the ordinary course of business defense is unavailable.

### III.    The precise extent of the new value defense cannot be determined on the existing record.

The parties agree that C.H. Robinson provided the debtor with approximately $1.9 million in otherwise unavoidable new value after it had received the payments in question and that it is entitled to a new value defense under § 547(c)(4) to the extent of the new value provided.  The parties disagree, however, on the precise amount of new value provided – with the difference in the parties' calculations coming to approximately $43,000.[78]    Based on the materials attached to the summary judgment briefing, there appears to be a genuine dispute of material fact with respect to the amount of new value provided that precludes the entry of summary judgment on this issue.

In addition, because a calculation of the new value provided depends on the timing and amount of the alleged preferential transfers, the trustee should be afforded an opportunity to re-calculate the new value it acknowledges C.H. Robinson

---

[78] *Compare* D.I. 28-1, Ex. F (trustee's declaration, showing $1,923,624.28 in new value) with D.I. 30-1 at 92-222 of 222 (defendant's exhibit showing $1,966,343.17 in new value).

provided based on the Court's determination (in Part I) to accept C.H. Robinson's schedule of the dates and amounts of the otherwise avoidable preferential payments.

Given the relatively small differences between the parties' calculations, it is certainly possible that the parties may be able to compromise the dispute over the amount of new value and reach an agreed figure. If not, however, the Court is prepared to proceed to a prompt trial on that issue. For current purposes, the trustee's motion for summary judgment regarding the amount of C.H. Robinson's new value defense will be denied.

## IV. The trustee is entitled to partial summary judgment on its entitlement to prejudgment interest at .07 percent.

The trustee seeks an award of prejudgment interest on any amount the trustee is otherwise entitled to recover as an avoided preference. As a general proposition, "prejudgment interest should be awarded [in a preference case] unless there is a sound reason not to do so."[79] The trustee further contends that the applicable rate is the federal judgment rate in effect at the time of the filing of the complaint, which is .07 percent.[80] C.H. Robinson's opposition brief does not contest the trustee's motion with respect to the prejudgment interest claim.[81] The Court will accordingly grant partial summary judgment in the trustee's favor, and award prejudgment interest at

---

[79] *In re Hechinger*, 489 F.3d at 580 (citing *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir.1997)).

[80] D.I. 28 at 25-27.

[81] D.I. 30.

.07 percent on the amount ultimately awarded, running from the date of the complaint through the date on which judgment is entered.

### Conclusion

For the reasons described above, the Court will: (a) grant partial summary judgment in favor of the trustee on the claim that the debtor had made $3,125,856.14 in presumptively avoidable payments during the preference period; (b) grant partial summary judgment in favor of the trustee on the question of the applicability of the ordinary course defense; (c) deny the trustee's motion for partial summary judgment with respect to the new value defense; and (d) grant partial summary judgment in favor of the trustee on the trustee's entitlement to prejudgment interest running at .07 percent from the filing of the complaint until the entry of judgment.

The parties are directed to reach out to chambers to schedule a status conference to address how to proceed in view of these determinations.

Dated: January 15, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE